UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

**FILED**

99 NOV -3 PM 4: 22

U.S. DISTRICT COURT
N.D. OF ALABAMA

JOHN DOE, )
)
    Plaintiff, )
)
vs. )Civil Action No. CV-97-S-1108-NE
)
M&D MECHANICAL CONTRACTORS, )
et al., )
)
    Defendants. )

**ENTERED** DW

NOV - 3 1999

### MEMORANDUM OPINION

    Defendants M&D Mechanical Contractors ("M&D") and United Labor

Force, L.L.C. ("United") request reconsideration of their motions

for summary judgment in light of recent decisions rendered by the

Supreme Court in *Murphy v. United Parcel Service, Inc.*, ___ U.S.

___, 119 S.Ct. 2133, ___ L.Ed.2d ___ (1999), and *Sutton v. United

Air Lines, Inc.*, ___ U.S. ___, 119 S.Ct. 2139, ___ L.Ed.2d ___

(1999).

### I. FACTUAL BACKGROUND

    Defendant United, an employment agency, hired plaintiff John

Doe[1] in early July of 1994. (Book's deposition at 49; defendant

United's exhibit L.) Plaintiff's first job assignment by United

---

    [1] On November 12, 1997, plaintiff requested a protective order to proceed
in this action as a John Doe plaintiff and to further seal all records filed with
the court that identifies plaintiff by name. As grounds for his motion,
plaintiff stated that he had obtained a position with another employer and did
not want the information to be publicized to those with whom he works. The court
granted plaintiff's motion on November 14, 1997.

was to work at Dunlop Tire and cross the picket line during a strike. (Doe's deposition at 61, 64.) Plaintiff worked the entire strike and then returned to Dunlop Tire to perform additional work following the strike. (*Id.* at 62, 64.)

Plaintiff's next major assignment by United occurred on March 4, 1996, when he was assigned to work for defendant M&D on the Adtran construction project in Huntsville, Alabama. (*Id.* at 66.) Although M&D employed its own workforce, it needed additional, temporary manpower to fulfill its contractual responsibilities on the Adtran project. (Putman's deposition at 27-28, 30-31.) Those duties consisted of installation of the heating and cooling system, associated air handling units, fixtures for the bathrooms, kitchen, and break areas, and correlative plumbing work for such fixtures. (*Id.* at 26.)

When plaintiff initially reported for work, the Adtran project was nothing more than an open, five-story steel and concrete skeleton that lacked even a guardrail or cable around the perimeter of the framework. (Doe's deposition at 66-68.) Plaintiff, a sheet metal mechanic whose duties included the installation of duct work, frequently worked on ladders, often near the edge of the structure. (*Id.* at 68.) Plaintiff described the working conditions as

2

"harsh," and said workers made:

> numerous complaints about there not being something we
> could tie off to when we first got there. ... [W]e
> thought it was a safety hazard. You could easily —
> because we were working on the outside of the
> building.... I mean, 2 feet away from the edge — the
> edge of the ladder was right there.
>
> ...
>
> And somebody would have to hold the ladder to keep us —
> we didn't have belts; we didn't have any safety
> equipment, at that time, when we first got there.

(Doe's deposition at 68-69.) At one point, the working conditions
were made even more difficult by a "big snow.... The temperature
was in the teens and the twenties, with the wind gusting 12 to 15
miles an hour." (*Id.*) In spite of all that, other M&D employees
formed the opinion that plaintiff was a good worker. (Garner's
deposition at 21, 24; Putman's deposition at 42-43; Horton's
deposition at 17, 78.)

Plaintiff began work on the Adtran project on Monday, March 4,
1996. He was absent the first two days of his second week on the
job, *i.e.*, on Monday and Tuesday, March 11 and 12, 1996, due to a
chest cold.[2] (Plaintiff's deposition at 71.) "I've already stated

---

[2] The court notes a discrepancy in the explanation given for plaintiff's
absence from work on these two days. Plaintiff testified that his absence was
due to a chest cold, and has provided a copy of his emergency room discharge
papers to support that contention. (Plaintiff's deposition at 71-72 and Exhibit
9.) Plaintiff's superintendent, Johnny Horton testified, on the other hand,
that he does not remember plaintiff telling him about his cold and "I didn't pry,
but I took it the way he was talking he was off a couple of days to get started
on his medication" for the schizoaffective disorder discussed on the following

3

the temperature and the conditions, the weather. We were out in the elements. And I went to — if I am not mistaken, Decatur General Hospital." (*Id.*)

On Wednesday, March 13, 1996, when plaintiff returned to work at the Adtran site, he approached Johnny Horton, a field superintendent for M&D. (*Id.* at 73; Horton's deposition at 17.) Plaintiff told him that he had been diagnosed as suffering from paranoid schizophrenia, and that he thought Horton should know because of the dangerous job conditions. (Plaintiff's deposition at 73-74.) Plaintiff also related that, at times, his condition caused him "to get real agitated and become disoriented." (*Id.* at 75.) Plaintiff nevertheless reassured Horton that he had not recently experienced any problems, because his condition "had stabilized, ... it was being controlled by medication." (*Id.* at 74.) Horton remembers asking plaintiff what he was like without his medication. (Horton's deposition at 18.) According to Horton, plaintiff replied that "I could close my eyes and when I open[ed] my eyes, I could just be in another world, another country ... and

_____

pages. (Horton's deposition at 21, 27.) In addition, M&D's office manager, Rudy Putman, contends that Horton reported plaintiff's absence as due to his mental condition. (Putman's deposition at 49.) The court must view the evidence in the light most favorable to plaintiff, however, and, accordingly, accepts plaintiff's contention that his absence was due to a chest cold. The court is puzzled by plaintiff's choice of timing, *i.e.*, his decision to reveal his mental condition after being treated in the emergency room for unrelated health problems.

4

I could run and jump off the building; but as long as I'm on my medication, I'm okay." (*Id.* at 18-19.)[3]

Plaintiff also presented Horton three pieces of paper documenting his mental condition and prescribed medication. (*Id.* at 75-79.) First, plaintiff furnished a copy of his discharge instructions from the Alvin C. York VA Medical Center in Murfreesboro, Tennessee, a one-page document, showing that he was admitted on February 13, 1995, and discharged on February 24, 1995. (*Id.* at 77-79, Exhibit 10.) That document reflected a diagnosis of "psychotic disorder and post traumatic stress disorder." (*Id.* at 78, Exhibit 10.) Plaintiff was placed on medication to control his hallucinations. (*Id.*) Although plaintiff's physician wrote something under the category of physical activity limitations, that writing is illegible to the court, but was explained by plaintiff as follows:

Q. If you will, look at Exhibit 10, please.
A. All right.
. . .
Q. But these papers are what you gave Johnny Horton?
A. Yes, sir.
Q. Did you have an understanding about what your restrictions were?
A. At that time I had no restrictions.
Q. Well, the box down here (indicting) is marked

_____

[3] Plaintiff does not recall revealing that information to Horton. (Plaintiff's deposition at 83-84.)

5

"restrictions," and there is some writing underneath
that, which I can't read.
A.  Look at the date on that.
Q.  Yes, I see —
A.  It's dated February of '95.
Q.  Yes.
A.  I was in the hospital after that, and they cleared me
of my restrictions.

(*Id.* at 77-78.)

Page two of the documents supplied to Horton consisted of
plaintiff's discharge summary, documenting his hospitalization at
York from March 23 to April 17, 1995.  (*Id.* at Exhibit 10.)
Plaintiff was diagnosed with schizoaffective disorder[4] and post
traumatic stress disorder.  (*Id.*)  This document specified that
plaintiff had no physical activity restrictions or discharge
dietary instructions.  (*Id.*)  The physician prescribed loxapine to
control plaintiff's hallucinations.  (*Id.* at 78-79.)

Page three of the documents supplied to Horton consisted of
another one-page discharge summary, documenting plaintiff's
hospitalization at York from September 12 to October 11, 1995.

_____

[4] For the record, the court notes that, in his complaint, plaintiff claimed
that he "has been diagnosed with paranoid schizophrenia which is controlled by
medication."  (Plaintiff's complaint ¶ 3 (emphasis supplied).)  In his brief in
response to defendants' motions for summary judgment, however, plaintiff argues
that his mental impairment is "schizoaffective disorder," (Plaintiff's response
at 4, 34 (emphasis supplied)), a condition defined by Dorland's Illustrated
Medical Dictionary 1491 (28th ed. 1994), as one that "exhibit[s] features of both
schizophrenic and mood disorders."  The court will limit its discussion
accordingly.

(*Id.* at Exhibit 10.)    Plaintiff was again diagnosed with schizoaffective disorder and post traumatic stress disorder. (*Id.*) The document specified that plaintiff had no physical activity restrictions or discharge dietary instructions.    (*Id.*)    The document also noted that plaintiff previously had a reaction to his medication, and again prescribed loxapine, to control his hallucinations. (*Id.* at 78-79.)

After reviewing plaintiff's paperwork, Horton told plaintiff that "[e]verything was fine," and that he could "[g]o back to work." (*Id.* at 79-80; Horton's deposition at 19.)   Horton added, however, that he needed to forward plaintiff's medical information to the "office [at M&D] and get back with you on it." (Plaintiff's deposition at 80; Horton's deposition at 19.)

After plaintiff left Horton's office, Horton called Rudy Putman, M&D's office manager, and recounted his conversation with plaintiff. (Putman's deposition at 48.) Specifically, Horton told Putman that plaintiff had a "mental condition," that the condition was controlled by medication, that the condition was responsible for plaintiff's absence from work the previous Monday and Tuesday,[5] and that plaintiff supplied him with copies of medical records.

---

[5] *See supra* note 2.

7

(*Id.* at 48-49.) Putman directed Horton to send him the records, but said that "it was not a problem as long as he took his medication." (*Id.* at 53.) Putman, in turn, disclosed plaintiff's condition to Bobby Allfrey, the president of M&D.[6] (Putman's deposition at 54.)

Johnny Horton told Leon Garner, a "lead man" and plaintiff's immediate supervisor, that plaintiff was taking medication, "some strong medication, [and] for [Garner] to, you know, keep an eye out on him, watch him more carefully than ... others out there on the floor." (Garner's deposition at 35; Horton's deposition at 35-36.) Although Horton did not tell Garner why plaintiff was taking medication, Garner admits he knew that plaintiff had a mental problem from talking with some of the other employees. (Garner's deposition at 35-36.) After requesting Garner to carefully observe plaintiff, Horton asked Garner "every day or every other day" if plaintiff's "medication seem[ed] to be working; is he doing okay;

---

[6] Putman also alleges that, during the week of March 16, 1996, he contacted defendant United. (Putman's deposition at 88-89.) Specifically, Putman alleges that he contacted Melinda Book, one of United's co-owners, presented the information regarding plaintiff's medical condition, and asked Book if she had knowledge of the information. (*Id.*) According to Putman, Book denied any knowledge of plaintiff's condition and asked Putman if M&D wanted him removed from the project, because "she had work at a higher rate of pay." (*Id.* at 89.) Putman replied that plaintiff "could do the work as long as he controlled his medication." (*Id.*) Book denies having this conversation, denies talking with anyone at M&D after plaintiff was hired, and claims she had no knowledge of plaintiff's medical condition until plaintiff revealed his condition to her on Monday, April 1, 1996. (Book's deposition at 21, 24, 39.)

8

do you see any changes...." (Horton's deposition at 38.) Garner replied that plaintiff seemed to be feeling fine. (*Id.*)

Around 1 o'clock p.m. on Friday, March 29, 1996, however, plaintiff told Garner that he might not be able to work his full shift. (Plaintiff's deposition at exhibit 2.) Shortly thereafter, plaintiff started crying while he was working on a ladder on an upper floor of the Adtran building. (*Id.* at 84-85; Garner's deposition at 28.) Plaintiff "sat down and leaned against some ductwork, to try to get [himself] together." (Plaintiff's deposition at 85.) Garner saw plaintiff crying, asked him if he was feeling well, and asked whether he needed to go home. (*Id.* at 86; Garner's deposition at 27.) Plaintiff replied that he did not want to go home, and to "[j]ust let me regain my composure, and I will get back to work." (Plaintiff's deposition at 86; Garner's deposition at 28.) Garner stayed with plaintiff for about ten minutes, until plaintiff calmed down. (Garner's deposition at 27.) Garner said he was concerned about other men working around plaintiff, because:

> I was worried that he'd get upset again. And, like I say, you're working close to the edge of the building four stories up. And he might could just throw his arms up or something and knock somebody off the building or throw hisself [sic] off the building or fall off of his ladder or - you know, there's openings in the floor. And

9

I was just upset about him being on that floor, and I
wanted him off the floor.

(*Id.* at 55-56.)

Plaintiff eventually regained his composure and returned to
work, but admits that he "was still crying a little bit here and
there, but [he] was keeping it together." (Plaintiff's deposition
at 86.) Even so, around two o'clock p.m., plaintiff decided that
he needed to go home. (*Id.*). He approached Garner and said,
"[m]an, I guess I do need to go home. It would be for the best."
(*Id.*) About that time, Horton walked over to where plaintiff and
Garner were standing and overheard Garner tell plaintiff to "[g]o
ahead and go home." (*Id.*) Plaintiff did so, but left his tools on
the job site, because he planned to return to work the following
day.[7] (*Id.* at 87.)

After plaintiff departed, Garner told Horton about plaintiff's
"crying spell." (Garner's deposition at 29; Horton's deposition at
55.) Garner also said:

I do remember telling [Horton], John don't [sic] need to
be out there on that job, doing the work that we're doing
out there and working close edge [sic] to the building
and stuff, like that, you know.

---

[7] Plaintiff claims that, as he was leaving the job site, he said "[w]ell,
I will see you tomorrow morning," and Garner replied, "[o]kay, we will see you
in the morning." (Plaintiff's deposition at 86-87.) Garner denies having the
conversation. (Garner's deposition at 29.)

10

. . .
>I was concerned about John's work there on the job.  I
>mean, I told him I didn't -- you know, him in that shape,
>he didn't need to be up there working up high like that.

(Garner's deposition at 33-34.)

Horton "was very upset," and told Garner that he needed to

call Putman.  (Horton's deposition at 55; Garner's deposition at

30-31.)  Horton then called Putman and told him about plaintiff's

"crying spell," that plaintiff "wasn't on his medication,[8] and

that ... he had asked — Leon had asked him did he need to go

home."  (Horton's deposition at 58-59.)  That same Friday, Putman

relayed the information to Kenneth Prater, the vice-president of

---

[8] The parties contest whether plaintiff, on the day of the crying incident,
told Garner that he was not taking his medication.  Plaintiff contends that he
did, in fact, take his medication and that he never told anyone anything to the
contrary.  (Plaintiff's deposition at 85.)  In contrast, Garner alleges
plaintiff confided that he did not take his medication on the day in question.
(Garner's deposition at 26.)  Garner relayed this disputed fact to Horton.  (Id.
at 29.)  Plaintiff's assertion that he had a crying spell in a fully-medicated
state, however, is not at odds with his repeated deposition testimony that
medication renders him functional.  Rather, plaintiff contends that the crying
spell that occurred on March 29, 1995, was not the result of his condition.

>Q.    Did you have a psychotic episode while you were on the job at
>      M&D?
>A.    No, sir.
>Q.    You went into a crying —
>A.    I had a crying spell, yes, sir.
>Q.    But that was not a psychotic episode?
>A.    No, sir.
>Q.    How do you know?
>A.    I didn't hallucinate.  At no time was I wanting to harm
>      anybody or myself.  I just wanted to sit there, gather myself,
>      and get back to work, which I did....

(Plaintiff's deposition at 49.)

11

M&D, and asked him to call defendant United and request that plaintiff "not come back to our site until his medication was corrected." (Putman's deposition at 76-78, 86, 90.) Melinda Book, one of United's co-owners, denies that she received a call from Prater. (Book's deposition at 24, 39.[9])

After the crying incident, plaintiff was not allowed to return to his job with M&D. Although he returned to the Adtran site on Saturday morning, Horton sent him home before plaintiff began working, saying that plaintiff was not scheduled to work. (Plaintiff's deposition at 90; Horton's deposition at 62.) The following Monday, plaintiff talked to Book at defendant United's office.[10] (Plaintiff's deposition at 91-92.) Plaintiff was concerned about the tools he left at the Adtran site, but Book explained that someone at defendant M&D already had returned them to her. (Id. at 92; Book's deposition at 37-38.) From this point on, plaintiff and Book describe their conversation very differently. Plaintiff described the conversation as follows:

_____

[9] See also note 6 and accompanying text supra.

[10] Plaintiff contends that he actually talked with Book Sunday night and she told him not to "go back on the job site." (Plaintiff's deposition at 91.) According to plaintiff, Book also told him to come to her office on Monday morning. (Id. at 92.) Book, however, contends that she did not speak to plaintiff on Sunday and that when she arrived at work, plaintiff "was already there, and he asked me if he could speak to me privately." (Book's deposition at 28.)

12

P.04

256 551 0741

NOV-03-1999  17:06

> She said, "[John], what is going on?" And I said, "What
> do you mean, what is going on? Did you not hear about
> what happened or whatever?" And I asked her -- I said,
> "Why am I not out there on that job? What's going on?"
> And she said, "Well, I took you off that job." I said,
> "What?" And she said, "Yeah, I took you off that job."
> And I said, "What?" I said, "Was my job performance --
> Was there something wrong with my job performance?" And
> she said, "No." She said, "I have never had a problem
> out of you, [John]." She said, "You are one of the best
> workers that we have." And I said, "What is the problem,
> then?" And she said, "Well, I heard you had a situation
> or something out there on the jobsite." ... And I said,
> "Well, I had a crying spell...."

(Plaintiff's deposition at 95-96.) In contrast, Book describes the

conversation as follows:

> I remember that John and I talked for some time, and he
> told me he believed himself to be a safety hazard to
> himself or possibly his coworkers. And his exact words
> were he needed an easier job. ... He said that he became
> disoriented, started crying uncontrollably, felt -- you
> know, he felt the spell coming on and decided not to make
> his supervisors aware of it. He thought he could handle
> it and it would pass, and it did not. And then he became
> uncontrollably upset, crouched down in the floor and
> began shaking and crying.

(Book's deposition at 31, 33-34.)

Nevertheless, both plaintiff and Book agree that they

discussed another possible position for plaintiff, an industrial

sales position. (Plaintiff's deposition at 96; Book's deposition

at 75-76.) Beyond that, they again diverge in their accounts of

what next occurred. Plaintiff contends that he expressed interest

in the industrial sales position, and that Book said she would get

13

P.04    256 551 0741

USDC HUNTSVILLE

NOV-03-1999  16:35

back in touch with him, but never did.[11]   (Plaintiff's deposition

at 96; Plaintiff's deposition, Volume II, at 110, 112-114.)   Book

alleges that she offered plaintiff more than one job, but he was

not interested in any of them.[12]   (Book's deposition at 75-80.)

Later that same week, plaintiff purchased a tape recorder.

(Plaintiff's deposition at 99-100.)   He decided to buy the recorder

---

[11]   Plaintiff testified, as follows, with regard to the industrial sales
position:

Q.   Following your job at M&D, were you offered a job at Post
     Welding for counter sales?

A.   I know it was an industrial sales position, but where it
     was....

. . .

     I was offered an industrial sales position, and I said, "Well,
     tell me more about it," and [Book] said that it would equal
     out to about $11 an hour, and I said, "Okay, I will take that
     if that is what I have to take." And she said, "Well, I will
     get back with you on it." And she never got back with me on
     it. Now, whether it was Post Welding Supply or not, I don't
     know.

(Plaintiff's deposition, volume II, at 14-15.)

[12]   Plaintiff admits that Book offered him two jobs, other than the
industrial sales position, as a forklift operator.   (Plaintiff's deposition,
volume II, at 96-97.)   He did not accept those positions, however, because he
contends that they were temporary and because they paid substantially less than
his position as a sheet metal mechanic.   (Id.)

Q.   You didn't want the forklift job?

A.   Well, why should I go from ten-and-a-half dollars to eleven
     dollars an hour on the M&D site, and get terminated, and turn
     around and have to take a five-to six-dollar-an-hour job?

. . .

A.   Especially when [Book] had already told me that she was going
     to send me out on an industrial sales interview — for that
     job.

(Id.)

14

because he felt "like I was being discriminated and prejudiced against, and I wanted some kind of record of that — you know, of what actually [was] going on here." (*Id.* at 100.) Plaintiff used the recorder to document several telephone conversations, including conversations with Horton, Putman, employees of defendant M&D, and Tami Ratcliff, an employee of defendant United. (Plaintiff's deposition at exhibit 11.) Of pertinent interest is plaintiff's conversation with Rudy Putman, M&D's office manager, detailed below:

> [Doe]    I was wondering why I can't come back out there on that job. And uh what the situation was exactly. What the problem with me being out there was.
> 
> . . .
> [Putman]  I don't really have anything to do with hiring practices of the company.
> 
> [Doe]    But you understand the uh, my condition, or [Horton] obviously made it aware to you because I gave you the documentation on it, and for some reason all of a sudden I'm not out there.
> 
> [Putman]  My understanding is based upon the situation that occurred out there while you were on the job, uh
> 
> [Doe]    I had a crying spell for about 5 to 10 minutes.
> 
> [Putman]  I understand that. <u>We are not prepared to deal with that kind of situation</u>.
> 
> [Doe]    <u>Well</u>, <u>my condition is controlled by</u>

15

medication. Ok, now I have like I say these
crying spells but they'll last 5 to 10 minutes
so they go away just as quick as they come.
... I never have loosed [sic] consciousness or
endangered anybody's life. I just sit there
for a second, regain my composure, I get back
at it. And that was the situation that day.
... You know, I'm going hungry right now. And
I'm trying to figure out how I can get back
out on ... get some work, you know. Ya'll
know I can do the job.

[Putman]   Well you know we uh.   We talked to your
employer.

[Doe]      Uh uh

[Putman]   and I think that is really who you should be
talking to instead of me.

[Doe]      Right. Well you know that it's the fact that
ya'll did not want me on the job after that
situation. ... And I need to ... know for my
own justification find out why. She said my
attendance was fine, my performance was fine.
So I just don't understand. I'm kind of
getting the run around everybody I talked to.
...

[Putman]   I'm being honest with you. <u>You know, it's
just like I told you earlier. I'm not
prepared to deal with the situation</u>.

(Plaintiff's deposition at exhibit 11 (emphasis supplied).)

## II. SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(c) provides that summary

judgment not only is proper, but "shall be rendered forthwith if

the pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits, if any, show that

16

there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. ..." (Emphasis added.) The movant bears the initial burden of showing the court, by reference to materials on file, that no genuine issues of material fact exist to be decided at trial. *See Celotex Corp. v. Catrett* , 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Clark v. Coats & Clark, Inc.*, 929 F.2d 604 (11th Cir. 1991). The moving party discharges this burden by "showing" or "pointing out" to the court that there is an absence of evidence to support the non-moving party's case. *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593 (11th Cir. 1995)(*per curiam*). Rule 56 permits the movant to discharge this burden with or without supporting affidavits. *See Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553. When the moving party has discharged its burden, the non-movant must go beyond the pleadings and designate specific facts showing there is a genuine issue for trial. *See Jeffery*, 64 F.3d at 593.

In deciding whether the moving party has met its burden, the court is obligated to draw all inferences from the evidence presented in the light most favorable to the non-movant and, also, to resolve all reasonable doubts in that party's favor. *See Spence*

17

*v. Zimmerman*, 873 F.2d 256 (11th Cir. 1989). Inferences in favor of the non-movant are not unqualified, however. "Mere general allegations which do not reveal detailed and precise facts will not prevent the award of summary judgment." *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 592 (11th Cir. 1995) (citation omitted). Moreover, evidence that is merely colorable, *see Brown v. City of Clewiston*, 848 F.2d 1534, 1537 (11th Cir. 1988), conclusory, *see Peppers v. Coates*, 887 F.2d 1493, 1498 (11th Cir. 1989), or conjectural, does not create a genuine issue of material fact.

Thus, if a reasonable fact finder evaluating the evidence <u>could</u> draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, then the court should not grant summary judgment. *See Augusta Iron & Steel Works v. Employers Ins. of Wausau*, 835 F.2d 855, 856 (11th Cir. 1988). A "genuine" dispute about a material fact exists if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Jeffery*, 64 F.3d at 594 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)). The bottom line is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a

18

matter of law." *Anderson,* 477 U.S. at 251-52, 106 S.Ct. at 2512.

### III. DISCUSSION

Congress enacted the Americans with Disabilities Act of 1990 ("ADA" or "the Act") for the stated purpose of providing "a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). Congress sought "to assure equality of opportunity, full participation, independent living, and economic self-sufficiency." 42 U.S.C. § 12101(a)(8). To achieve such purposes, the Act commands that:

> no covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

42 U.S.C. § 12112(a). The Act imposes an affirmative duty on employers to provide reasonable accommodations for disabled individuals. Thus, the term, "discrimination" is defined broadly, to include "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability ... unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business." 42 U.S.C. § 12112(b)(5)(A).

19

To establish a *prima facie* case of discrimination under the ADA,
a plaintiff must demonstrate: (1) that he has a "disability," as
hereinafter defined; (2) that he is a "qualified individual" (*i.e.*,
that he can perform the essential functions of the job position he
holds or seeks, with or without reasonable accommodation being made
by the employer[13]); (3) that the employer had actual or constructive
knowledge of his disability (*see Gordon v. E.L. Hamm & Associates,
Inc.*, 100 F.3d 907, 910 (11th Cir. 1996); and, (4) that he was
discriminated against (suffered an adverse employment action)
because of his disability. *See* 42 U.S.C. § 12132; *Pritchard v.
Southern Company Services*, 92 F.3d 1130, 1132 (11th Cir. 1996).

A plaintiff can establish that he has a "disability" in one of
three ways. Specifically, the ADA defines the concept of
"disability" in a manner that includes any individual:

(A)  who has a <u>physical or mental impairment</u> that
<u>substantially limits</u> one or more of the <u>major life
activities</u> of such individual, or

(B)  who has a <u>record of</u> such an impairment, or

(C)  who is <u>regarded as having</u> such an impairment.

---

[13] 42 U.S.C. § 12111(8) (defining "qualified individual with a disability"
as "an individual with a disability who, with or without reasonable
accommodation, can perform the essential functions of the employment position
that such individual holds or desires"). *See also* 29 C.F.R. § 1630.2(m)
("Qualified individual with a disability means an individual with a disability
who satisfies the requisite skill, experience, education and other job-related
requirements of the employment position such individual holds or desires, and
who, with or without reasonable accommodation, can perform the essential
functions of such position").

20

*See* 42 U.S.C. § 12102(2) (emphasis supplied). Plaintiff argues
that he qualifies under all three categories. The court will
examine each argument separately.

**A. Is Plaintiff Disabled?**

Plaintiff argues that he has a mental impairment, namely,
schizoaffective disorder,[14] and that this impairment substantially
limits a major life activity because:

> The record is full of undisputable evidence that the
> plaintiff must take his medication to avoid a total
> breakdown of an ability to function in society. If he stops
> taking his medication, the plaintiff can relapse into a
> stage where he has auditory hallucinations, visual
> hallucinations and paranoid thoughts so severe that he is
> afraid to set foot outside of his apartment.

(Plaintiff's response at 44.) In so arguing, plaintiff also relies
heavily on the Eleventh Circuit's decision in *Harris v. H&W
Contracting Company*, 102 F.3d 516, 520 (11th Cir. 1997), wherein
the court adopted the following EEOC regulations:

> The determination of whether an individual is substantially
> limited in a major life activity must be made on a case by
> case basis, without regard to mitigating measures such as
> medicines, or assistive or prosthetic devices.

*Harris*, 102 F.3d at 520 (emphasis supplied) (citing 29 C.F.R. app.
§ 1630.2(j) (1996)). The court finds, however, that plaintiff's
argument is no longer persuasive (and parenthetically that the

---

[14] *See* note 4 *supra*.

21

Eleventh Circuit's holding in *Harris* is no longer binding
precedent) in light of recent Supreme Court decisions.

In *Sutton v. United Air Lines, Inc.*, 119 S.Ct. 2139 (1999), and
*Murphy v. United Parcel Service, Inc.*, 119 S.Ct. 2133 (1999), the
Supreme Court resolved a split among the federal courts of appeals
concerning whether mitigating measures should be considered when
determining if an employee's impairment "substantially limits" a
major life activity. The Court concluded that "the approach
adopted by the [EEOC] guidelines — that persons are to be
evaluated in their hypothetical uncorrected state — is an
impermissible interpretation of the ADA." *Sutton*, 119 S.Ct. at
2146. The Court reasoned:

> Because the phrase "substantially limits" appears in the Act
> in the present indicative verb form,[15] we think the
> language is properly read as requiring that a person be
> <u>presently</u> — <u>not</u> potentially or hypothetically —
> substantially limited in order to demonstrate a disability.
> A "disability" exists only where an impairment
> "substantially limits" a major life activity, not where it
> "might," "could," or "would" be substantially limiting if
> mitigating measures were not taken. <u>A person whose physical
> or mental impairment is corrected by medication or other
> measures does not have an impairment that presently
> "substantially limits" a major life activity.</u> To be sure,

---

15 Verbs are words which make assertions. "Since an assertion must be made
in connection with time (past, present, future), verbs are distinguished by
tense." V.F. Hopper & C. Gale, Essentials of Effective Writing 9 (1961). Thus,
"the present tense is used to state that something is so at the moment of
speaking or writing." *Id.* at 14.

22

a person whose physical or mental impairment is corrected by
mitigating measures still has an impairment, but if the
impairment is corrected it does not "substantially limit" a
major life activity.

*Sutton*, 119 S.Ct. 2146-2147 (emphasis supplied).

After carefully reviewing the record, this court finds that
plaintiff has failed to demonstrate that his mental impairment
"substantially limits" a major life activity. Specifically, the
record is replete with examples of plaintiff's earnest belief that,
when medicated, his psychotic episodes are controlled.
(Plaintiff's deposition at 46, 48-49, 74-75, 84.) Indeed, when
plaintiff talked to Horton about his mental impairment, he assured
Horton regarding his ability to work, saying that his condition
"had stabilized, that it was being controlled by medication."
(Plaintiff's deposition at 74.)

Plaintiff's attempts to distinguish *Sutton* from this case must
also fail. Specifically, plaintiff contends that his "condition,
schizoaffective disorder, is far graver a disability than bad
vision. [Citation omitted.]" (Plaintiff's response to defendants'
motions to reconsider at 4.)

The plaintiff's disability is not corrected simply by
putting on a pair of corrective lenses; rather, as detailed
in the briefs and evidence already submitted, the plaintiff
must go through a process of medication stabilization, in
order to find the proper dosage to control his condition and

23

eliminate the psychotic hallucinations.

*Id.*   The court accepts the assertion that a schizoaffective disorder *is* difficult to treat, as defendants' expert witnesses have opined. Dr. Roger C. Rinn, Ph.D., testified the condition is "probably the most difficult of the mental illnesses of the functional psychoses to treat right now" (Rinn's deposition at 86), an opinion echoed by Dr. William H. Goodson, M.D.: "under the best of circumstances, ... even with a very compliant patient, schizoaffective disorder is difficult to treat." (Goodson's deposition at 64.)   The court also notes that plaintiff, prior to his employment by defendants, had been hospitalized a number of times — often due, in part, to difficulties with his medication. (Defendant M&D's exhibit K, P, O.)

Even so, on the dates plaintiff was employed by defendants there is no evidence from which a reasonable factfinder could conclude that plaintiff's condition was not stabilized. Although plaintiff was indeed absent from work on March 11 and 12, 1996, his absence was due to a chest cold, and unrelated to his mental condition.[16] (Doe's deposition at 71.)   Moreover, plaintiff denies that his crying spell was a psychotic episode, *see* note 8 *supra*, and, thus,

---

[16] *See supra* note 2 and accompanying text.

24

the March 29, 1995 incident also fails to create an issue of fact. Accordingly, this court concludes that, on the dates plaintiff worked at the Adtran site, his mental impairment did not substantially limit his ability to work, because it was controlled by medication.

## B. Does Plaintiff Have a Record of Disability?

Plaintiff may still qualify as "disabled" if he meets the definition included in 42 U.S.C. § 12102(2)(B), namely if he proves that he is an individual who "has a record of" a physical or mental impairment that substantially limits one or more of his major life activities. "The intent of this provision, in part, is to ensure that people are not discriminated against because of a history of disability." 29 C.F.R. pt. 1630, App. § 1630.2(k) (1997). According to the EEOC, a person has a "record of such impairment" if an employer relies upon a record indicating that a person "has a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities," (29 C.F.R. § 1630.2(k) (1997)) when making an employment decision adverse to that person.

> This part of the definition [of "disability," *i.e.*, § 12102(2)(B)] is satisfied if a record relied on by an employer indicates that the individual has or has had a substantially limiting impairment. ... There are many types of records that could potentially contain this information,

25

including but not limited to, education, medical, or employment records.

29 C.F.R. pt. 1630, App. § 1630.2(k) (1997). The Eleventh Circuit has held, however, that:

the record-of-impairment standard is satisfied <u>only if</u> [a plaintiff] <u>actually suffered</u> a physical [or mental] impairment that substantially limited one or more of her major life activities. "The impairment indicated in the record must be an impairment that would substantially limit one or more of the individual's major life activities."

*Hilburn v. Murata Electronics North America, Inc.*, 181 F.3d 1220, 1229 (11th Cir. 1999) (quoting 29 C.F.R. pt. 1630, App. § 1630.2(k) (1997) (emphasis supplied)).

There is no question that plaintiff's ongoing struggle with mental illness has been well-documented. Specifically, the parties have supplied the court with a plethora of records detailing plaintiff's numerous hospital visits and confinements. Beginning as early as June of 1987, plaintiff was hospitalized at Eglin Air Force Base, where he was diagnosed as suffering from a "major depression with psychotic features." (Defendant M&D's exhibit B.) The relevant inquiry here, however, is whether defendants possessed actual or constructive knowledge of such records.

It is undisputed that plaintiff gave defendant M&D copies of three papers related to his treatment at the Alvin C. York VA Medical Center in Murfreesboro, Tennessee, detailing three of his

26

hospitalizations in 1995. There is no evidence, however, that defendants received any of the earlier records prior to the instigation of this lawsuit. Thus, the relevant inquiry focuses solely on the three 1995 discharge papers, and whether these records indicated that plaintiff had a substantially limiting impairment.

Defendants argue that the discharge papers fail to qualify, because the records certified that plaintiff had no physical activity limitations or other restrictions. Plaintiff argues that the record does qualify, because it revealed that plaintiff "had suffered and been treated for a psychotic illness." (Plaintiff's response to motion to reconsider at 14.)

The court finds that plaintiff has not met his burden with regard to 42 U.S.C. § 12102(2)(B). The 1995 discharge papers fail to indicate any greater degree of impairment than that argued by plaintiff with regard to § 12102(2)(A). Although the discharge papers do reveal that plaintiff spent approximately two months in the hospital during 1995, during which he was obviously unemployed, the Eleventh Circuit has held that such time is insufficient as a matter of law to constitute a substantial limitation in his ability to work. *See Hilburn*, 181 F.3d at 1229 (holding that plaintiff's thirty-eight day absence from work after she suffered a heart

27

attack "is an insufficient amount of time to support a claim that
she was substantially limited in the major life activity of
working") (citing with approval *Colwell v. Suffolk County Police
Department*, 158 F.3d 635, 646 (2nd Cir. 1998) (holding that "one
month hospital stay followed by six month home recuperation,
coupled with non-particularized and unspecific limitations upon
return to work, did not constitute substantial impairment in
ability to work"); *Sanders v. Arneson Prods.*, 91 F.3d 1351, 1354
(9th Cir. 1996) (holding that "three and a half month impairment
with minimal residual effects not substantially limiting")).

Moreover, the mere diagnosis of schizoaffective disorder is
insufficient to establish that plaintiff's mental impairment
substantially limited his ability to perform the major life
activity of working. *See* 29 C.F.R. § 1630.2(k). "What §
12102(2)(B) requires is not simply a diagnosis, but a record
reflecting the kind of impairment that would impose a substantial
limitation on one or more of the plaintiff's major life
activities." *Davidson v. Midelfort Clinic, LTD.*, 133 F.3d 499, 510
n.7 (7th Cir. 1998) (cited with approval in *Hilburn*, 181 F.3d at
1229.) Plaintiff's 1995 records do not reflect any restrictions[17]

---

[17] The court is mindful of the fact that plaintiff's February discharge
paper does have illegible writing under the category of restrictions. Plaintiff,

28

on plaintiff's ability to work, but simply provide a list of his
medications.   Therefore, the records serve only to corroborate
plaintiff's recitation of facts to Horton, specifically, that his
mental impairment is controlled with medication.

### C. Was Plaintiff "Regarded As" Disabled?

Finally, if an individual cannot satisfy either the first part
of the ADA's definition of "disability," or the second, "record of"
portion, he still may be able to satisfy the third prong of the
definition.  *See* 42 U.S.C. § 12102(2)(C).  The Supreme Court has
articulated two different ways in which an individual may satisfy
the definition of "being regarded as having a disability":

(1) a covered entity mistakenly believes that a person has
a physical impairment that substantially limits one or more
major life activities; or

(2) a covered entity mistakenly believes that an actual,
nonlimiting impairment substantially limits one or more
major life activities.

*Sutton*, 119 S.Ct. at 2149-2150.   The Supreme Court has further
explained that, in both cases, the entity must:

entertain misperceptions about the individual — it must
believe either that one has a substantially limiting
impairment that one does not have or that one has a substan-
tially limiting impairment when, in fact, the impairment is

---

however, has testified that those restrictions were lifted in subsequent
hospitalizations and, thus, those restrictions are insufficient to create an
issue of fact.

29

not so limiting. These misperceptions often "resul[t] from
stereotypic assumptions not truly indicative of ... individ-
ual ability."

*Id.* at 2150 (citations omitted).

If the impaired major life activity is that of working,[18] the

EEOC defines "substantially limits" as:

significantly restricted in the ability to perform either a

---

[18] At this court's motion docket, held on October 18, 1999, plaintiff
argued that defendants not only regarded him as being disabled in the major life
activity of working, but also in the major life activities of thinking and caring
for himself. Plaintiff cited *Taylor v. Pheonixville School District*, 184 F.3d
296 (3rd Cir. 1999), in support of his argument that thinking is a major life
activity covered by the ADA.

The court need not reach this issue, however, as plaintiff has failed to
amend his complaint to insert such a claim. In plaintiff's complaint, filed on
May 2, 1997, and in his first amended complaint, filed on November 14, 1997,
plaintiff alleged only that he was "perceived or regarded as having a disability
which substantially limits his ability to work...." (Complaint ¶ 3 (Doc. No. 1;
first amended complaint ¶ 3 (Doc. No. 15.) Plaintiff failed to make any mention
of his claim that defendants also regarded him as disabled in his ability to
think and care for himself.

Moreover, in the scheduling order entered on September 30, 1997, the court
established a definitive deadline for amendments to the pleadings, by stating
that "[n]o causes of action, defenses, or parties may be added after this date."
(September 30, 1997 Order (Doc. No. 9) ¶ 1.) Plaintiff has never requested an
extension of this deadline or filed a motion for leave to amend his complaint.

Nevertheless, in response to defendants' motions for summary judgment,
plaintiff buried the following argument in a seventy-five page brief: "[i]n this
case now before this Court, the plaintiff is not claiming a disability based ...
solely upon his or her [sic] inability to work. Rather, the plaintiff claims his
disability substantially impairs his ability to care for himself when not
medicated and M&D regarded it as such." (Plaintiff's response (Doc. No. 82) at
59-60.) Additionally, at the court's motion docket, plaintiff argued for the
first time that defendants regarded him as disabled in his ability to think.
(*See* M&D's motion to submit supplemental authority following oral argument (Doc.
No. 11) ¶ 1.)

The court, however, refuses to entertain such additional claims, as to do
otherwise would allow plaintiff to tacitly amend his complaint without prior
court approval. Such amendment also would prejudice defendants, as discovery in
this action has long been closed and this matter is quickly approaching trial.
Accordingly, the court restricts its analysis to plaintiff's claim that
defendants regarded him as disabled in his ability to work.

30

class of jobs or a broad range of jobs in various classes as
compared to the average person having comparable training,
skills and abilities.  The inability to perform a single,
particular job does not constitute a substantial limitation
in the major life activity of "working."

29 C.F.R. § 1630.2(j)(3)(i).  The EEOC also defines "class of jobs"

as:

The job from which the individual has been disqualified
because of an impairment, and the number and types of jobs
utilizing similar training, knowledge, skills or abilities,
within that geographical area, from which the individual is
also disqualified because of the impairment.

29 C.F.R. § 1630.2(j)(3)(ii)(B) (emphasis supplied).  A "broad

range of jobs in various classes" is defined as:

The job from which the individual has been disqualified
because of an impairment, and the number and types of other
jobs not utilizing similar training, knowledge, skills or
abilities, within that geographical area, from which the
individual is also disqualified because of the impairment.

29 C.F.R. § 1630.2(j)(3)(ii)(C) (emphasis supplied).

In determining whether an individual is substantially limited
in the ability to perform either a class of jobs or a broad range
of jobs in various classes, courts may consider factors such as
"the number and types of jobs utilizing similar training, knowl-
edge, skills or abilities, within [the] geographical area [reason-
ably accessible to the individual], from which the individual is
also disqualified."  § 1630.2(j)(3)(ii)(B).  "[S]ubstantially
limits requires, at a minimum, that plaintiffs allege they are

31

unable to work in a broad class of jobs." *Sutton*, at 2151.

Therefore, to recover under 42 U.S.C. § 12102(2)(C), plaintiff must prove that both defendants regarded him as being significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes, not just his position as a sheet metal mechanic. The court finds that plaintiff has failed to carry his burden with regard to defendant M&D, but that genuine issues of material fact exist with regard to defendant United that preclude summary judgment. The court will address the proffered evidence with regard to each defendant.

### 1.    Defendant M&D

With regard to defendant M&D, it is undisputed that plaintiff notified Horton of his schizoaffective disorder on Wednesday, March 13, 1996. Plaintiff testified that he wanted M&D to know about his condition due to the fact that "the situation out there was dangerous because of ... not having the cables up ... [a]nd [although] I hadn't had any problem in awhile with my disability, ... I wanted to tell them, you know, in case something were to happen." (Plaintiff's deposition at 73.) Plaintiff told Horton that his condition was stabilized due to his medication; and after Horton reviewed the discharge papers plaintiff provided, he told plaintiff to "[g]o back to work" and that "[e]verything was fine."

32

(*Id.* at 79-80.)

Thus, it is undisputed that M&D did not immediately fire plaintiff because of a perceived disability. M&D allowed plaintiff to continue his employment with the exact responsibilities that he held prior to his disclosure. Although it is true that Horton directed Garner to monitor him carefully while he was working on the job site, plaintiff continued to perform sheet metal work without restriction for more than two weeks, until the crying spell occurred on March 29, 1996.

Moreover, plaintiff testified that even after his crying incident, M&D allowed him to go back to work. Although Garner asked plaintiff if he needed to go home, plaintiff testified that he did not want to go home, "[j]ust to let me regain my composure, and I will go back to work." (Plaintiff's deposition at 86; Garner's deposition at 28.) Plaintiff temporarily climbed up on his ladder and began working, but then, minutes later, plaintiff voluntarily approached Garner and said he needed to go home. Therefore, even on the day of plaintiff's crying spell, M&D acted reasonably and did not jump to stereotypical conclusions about his ability to work.

The only damaging evidence that plaintiff has proffered against M&D is Garner's own admission that he was concerned about plain-

33

tiff's safety and the safety of other M&D employees:

> I was worried that he'd get upset again. And, like I say, you're working close to the edge of the building four stories up. And he might could just throw his arms up or something and knock somebody off the building or throw hisself [sic] off the building or fall off of his ladder or - you know, there's openings in the floor. And I was just upset about him being on that floor, and I wanted him off the floor.

(Garner's deposition at 55-56.) Admittedly, Garner expressed these concerns to Horton, when he relayed the occurrence of plaintiff's crying spell:

> I do remember telling [Horton], John don't [sic] need to be out there on that job, doing the work that we're doing out there and working close edge [sic] to the building and stuff, like that, you know.
> . . .
> I was concerned about John's work there on the job. I mean, I told him I didn't -- you know, him in that shape, he didn't need to be up there working up high like that.

(*Id.* at 33-34.)

Thus, at most, plaintiff has shown that M&D regarded him as unable to work as a sheet metal mechanic on a ladder four or five stories above the ground, in an open, steel and concrete skeletal framework of a building. Plaintiff has not put forward any evidence that M&D regarded him as unable to perform any sheet metal mechanic job that does not require him to work at high elevations

34

in hazardous conditions.[19]   Because the perceived inability to
perform a single, particular job does not constitute a substantial
limitation in the major life activity of working, plaintiff's
claims against defendant M&D are due to be dismissed.   *See Murphy*,
119 S.Ct. at 2138 (holding that petitioner has only "shown that he
is regarded as unable to perform the job of mechanic ... when that
job requires driving a commercial motor vehicle" and such proof is
"insufficient as a matter of law, to prove that petitioner is
regarded as substantially limited in the major life activity of
working"); *Witter v. Delta Air Lines, Inc.*, 138 F.3d 1366 (11th
Cir. 1998) (noting that employer regarded pilot as unable to fly a
commercial airplane to due his mental condition, bipolar disorder,
but holding that "piloting airplanes is too narrow a range of jobs

---

[19] Plaintiff relies on the testimony of James Anders, a sheet metal
superintendent employed by M&D, to argue that M&D did, in fact, regard him as
unable to perform any type of sheet metal work. Specifically, Anders testified
that, at least one M&D employee has transferred from the "field" to a job in
M&D's sheet metal shop, where they fabricate, rather than install, sheet metal.
(Anders' deposition at 32-33.)

Plaintiff, however, never requested that M&D transfer him to a job in its
sheet metal shop. Moreover, plaintiff never requested that M&D accommodate him
in any other way, *i.e.*, by allowing him to install sheet metal on the bottom
floor of the Adtran building. Although the ADA imposes on employers a duty to
provide a reasonable accommodation unless doing so would result in an undue
hardship to the employer, see 42 U.S.C. § 12112(b)(5)(A), the Eleventh Circuit
has held that an employer's duty to accommodate "is not triggered unless a
specific demand for an accommodation has been made."   *Gaston v. Bellingrath
Gardens & Home, Inc.*, 167 F.3d 1361, 1363 (11th Cir. 1999); *see also* 29 C.F.R.
pt. 1630 App. § 1630.9 (providing that "[i]n general ... it is the responsibility
of the individual with a disability to inform the employer that an accommodation
is needed"). Accordingly, plaintiff's failure to meet his burden of requesting
an accommodation is also fatal to his claims against M&D.

35

to constitute a 'class of jobs' as that term is defined in 29
C.F.R. § 1630.2(j)(3)(ii)(B)").

## 2. **Defendant United**

In contrast to the evidence proffered against M&D, the evidence
submitted by United and plaintiff is contradictory in several
material aspects. First, plaintiff and defendant United strin-
gently contest whether plaintiff voluntarily resigned from his
position with M&D because he "needed an easier job," or whether he
was removed from the job by United. Specifically, plaintiff
contends that Book told him that she, not anyone at M&D, removed
him from the Adtran construction project. (Plaintiff's deposition
at 95.) Book, however, testified that plaintiff voluntarily
resigned from the job with M&D, because "he believed himself to be
a safety hazard." (Book's deposition at 31.) This dispute lies at
the very core of whether United regarded plaintiff as being unable
to perform either a class of jobs or a broad range of jobs in
various classes.

Additionally, Book contends that she offered plaintiff eight
different jobs (see Book's deposition at 92), but plaintiff asserts
that Book asked him about only three other jobs: an industrial
sales position and two forklift operator positions. United argues
that, because Book offered plaintiff other positions, it did not

36

regard plaintiff as being disabled from a class or broad range of
jobs.

Considering the facts in the light most favorable to plaintiff,
that United only offered him three other positions, the court is
not persuaded by United's argument.  With regard to the two
forklift operator positions, the court notes that these positions
paid only half of plaintiff's former salary and, therefore, do not
disprove his allegation that United regarded him as disabled.
"Such a pretextual offer cannot shield the employer from ADA
liability for its discriminatory actions."   *Equal Employment
Opportunity Commission v. Gallagher Company*, 181 F.3d 645, 656-57
(5th Cir. 1999).  With regard to the industrial sales position,
which would have compensated plaintiff at a comparable rate,
plaintiff and Book dispute whether plaintiff was interested in and
accepted the position.  If the jury believes plaintiff's testimony
- - that he agreed to accept the position, but Book never formally
offered it to him - - such testimony could sustain plaintiff's claim
that United regarded him as being disabled from a broad range of
jobs in various classes.  Accordingly, summary judgment is due to
be denied.

### IV. CONCLUSION

For the reasons stated herein, the court finds that summary

37

judgment is due to be granted in part and denied in part. Specifically, the court finds that all of plaintiff's claims against defendant M&D are due to be dismissed. The court further finds that plaintiff's claims against defendant United under 42 U.S.C. §§ 12102(2)(A) and (B) are also due to be dismissed. Finally, however, the court finds that a genuine issue of material fact exists with regard to the issue of whether defendant United regarded plaintiff as disabled under 42 U.S.C. § 12102(2)(C) and, accordingly, summary judgment is due to be denied on that claim. An order consistent with this memorandum opinion will be entered contemporaneously herewith.

**DONE** this 3rd day of November, 1999.

_____
United States District Judge

38